**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | )  **Civil Action No. 3: 04-CV-1778-BF(K)** |
| | ) |
| **and** | ) |
| | ) |
| **MOHAMED S. ELMOUGY,** | ) |
| | ) |
| **Intervenor,** | ) |
| **v.** | ) |
| | ) |
| **OMNI HOTELS MANAGEMENT CORPORATION, OMNI HOTELS CORPORATION AND OMNI HOTELS OF TEXAS, INC.** | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## Memorandum Opinion and Order

This is a consent case before the United States Magistrate Judge. Plaintiff, Equal Employment Opportunity Commission ("EEOC"), brought this case on behalf of Mohamed Elmougy ("Elmougy"), the Charging Party and Intervenor. Defendants are Omni Hotels Management Corporation, Omni Hotels Corporation, and Omni Hotels of Texas Inc. (referred to collectively as "Omni" or "Defendant"). Elmougy was the former General Manager of Defendant's Omni Mandalay Hotel in Las Colinas, Texas. Plaintiff alleged that Omni constructively discharged Elmougy based on his national origin and his religion. Plaintiff also alleged that Omni's constructive discharge of Elmougy was in retaliation for opposing what Elmougy reasonably believed to be Omni's discrimination against minority employees.

The Court conducted a bench trial, commencing on September 4, 2007. For the reasons that follow, the Court finds that Defendant is entitled to judgment on Plaintiff's and the Intervenor's

claims and that Plaintiff and Intervenor shall take nothing by way of their cause of action.

## Statement of Stipulated Facts

The parties have stipulated to the following facts:[1]

1. Elmougy is a Muslim and an Arab, who is Egyptian by birth.

2. Omni Hotel Management Corporation and Omni Hotels Corporation are located in Irving, Texas.

3. At all times relevant to this lawsuit, Omni was an employer as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(A)(1).

4. Omni employed Elmougy from 1986 until his separation on January 11, 2002. Over his years with Omni, Elmougy worked at hotels in five (5) different cities.

5. In February 1996, TRT Holdings, Inc. purchased Omni from former owners.

6. On or about November 13, 2000, while working as General Manager of the Omni Park West in Farmers Branch, Texas, Omni announced Elmougy was being promoted to become General Manager of the Omni Mandalay in Las Colinas, Texas.

7. Elmougy reported to Todd Scartozzi ("Scartozzi"), Senior Vice President of Operations.

8. Not all Omni hotels are equal in quality, size, revenue, number of rooms, amenities, profitability, meeting space, or banquet facilities, and the hotels compete in different markets which vary in terms of leisure/resort or corporate business market, available corporate business, transient business, hotel space, and competitors.

9. On March 27, 2002, Elmougy filed a Charge of Discrimination with the EEOC, Number 310A201415.

---

[1] The parties' stipulation includes the following caveat: "Defendants maintain the 'Omni' entity that was Elmougy's employer is Omni Hotels Management Corporation. Defendants deny 'Omni' includes Omni Hotels Corporation and Omni Hotels of Texas, Inc. [Defendants'] reference to Omni in these stipulated facts includes only Omni Hotels Management Corporation. EEOC and Elmougy contend the "Omni" employer includes all the named defendants, and [EEOC and Elmougy's] use of "Omni" herein refers to all three entities."

# FINDINGS OF FACT

## I.

Omni Hotels Management Corporation ("Omni") is a corporation that maintains its corporate offices in Irving, Texas. Omni operates hotels and resorts throughout the United States, Canada, and Mexico, including flagship, or Tier 1, hotel properties like the Omni Mandalay at Las Colinas ("the Mandalay") and the Omni Shoreham in Washington, D.C. ("the Shoreham"). The corporate offices for Omni are located less than a mile from the Mandalay ("Corporate"), the only Omni flagship hotel in North Texas. In 2001, other Tier 1 properties included, for example, the Omni Berkshire, Omni Chicago, Omni Houston, Omni Interlocken, and Omni Parker House.

In February 1996, TRT Holdings, Inc. purchased the Omni hotel chain. Thereafter, Omni Hotels Management Corporation became the employer at most Omni hotels, including the Mandalay. At all times relevant to this lawsuit, Omni Hotels Management Corporation employed Elmougy. That entity paid Elmougy's salary, provided his benefits, withheld, reported and paid taxes on his behalf, and employed his superiors, who controlled the terms and conditions of his employment.

Defendant Omni Hotels of Texas, Inc. does not exist as a jural entity, that is, an entity which may sue and be sued. It has no indicia of incorporation or legal status of any kind, is not registered to do and does not do any business, does not have any assets, inventory or capital, and does not have any employees or officers. Omni Hotels of Texas, Inc. did not employ Elmougy.

Defendant Omni Hotels Corporation is a legal entity, but it has no employees or office space and did not employ Elmougy. Omni Hotels Corporation is a holding company for various Omni-related entities, and it does not issue paychecks or provide benefits. Because it has no employees,

it does not and cannot evaluate employees or exercise influence or control over any employment decisions, including transfers and promotions. It has never drafted nor implemented a comprehensive employment policy or regimented rules regarding employment practices for use by Omni Hotels Management Corporation. Because Omni Hotels Corporation has no employees to make decisions, it is not directly involved in Omni Hotels Management Corporation's daily decisions related to production, distribution, marketing, and/or advertising. The entities do not share services, records, and/or equipment. Omni Hotels Corporation does not purchase any materials or supplies from Omni Hotel Management Corporation, because the latter has no materials or supplies.

As Elmougy's employer, Omni Hotels Management Company is the only proper defendant in this case. To the extent the EEOC has attempted to prove that Omni Hotels Corporation, Omni Hotels Management Company, and Omni Hotels of Texas Inc. constitute an integrated enterprise, the EEOC's proof fails.

## **II**.

Omni assigns a General Manager ("GM") to a specific hotel. The GM has onsite responsibility for that hotel, with support from an Executive Operating Committee ("EC"). The GM acts as a conduit between the corporate office and the hotel, oversees hotel operations in all departments, and represents the hotel in its interactions with customers. Omni judges the performance of a GM by successful management of three distinct components, called "the trilogy." A GM must satisfy (a) owners (hotel revenues and profitability); (b) employees (also referred to as associates and the EC), and (c) guests. No two Omni hotels are alike; each one has its own distinct challenges.

The economic or "owner" performance of each Omni hotel is judged by revenue, profitability

("EBITDA" or earnings before interest, taxes, depreciation, and amortization), and sales (including pre-sales, or bookings). With regard to sales, Omni compares a hotel's performance to the performance of a small number of competitors in its geographic market, referred to as the "competitive set." Omni analyzes individual hotel performance against the competitive set based on three factors: (a) average room rate, (b) occupancy, and (c) revenue per available room ("RevPar"). RevPar represents the revenue per available room the hotel is receiving, computed by multiplying the average room rate by the percentage of occupancy. To analyze how a hotel is performing in these areas compared to the competitive set, Omni purchases the STAR report from Smith Travel Research. The STAR report is a monthly analysis which provides comparative data.

Omni also tracks pre-sales of future room nights, or "bookings," in monthly Booking Pace Reports. The Booking Pace Reports compare bookings to the current budget and to the same point in the prior year. Omni uses this report to project revenue production over six, twelve, and eighteen-month periods. This report allows Omni to compare a hotel's performance to all hotels in the chain, rather than those in the competitive set. Omni considers one of the best indicators of a hotel's performance to be a comparison of a hotel's current booking pace to the hotel's last year's booking pace.

The economic performance of each Omni hotel is also judged individually by profit and loss performance, as reflected by EBITDA. Profit and loss is reflected on various reports, including the monthly profit and loss statement for each hotel. Profit and loss reflects how a GM is performing with regard to revenues and the GM's management of expenses. Similarly to Omni's comparison of booking pace, Omni considers one of the best indicators of a hotel's profitability performance to be a comparison of its current profitability to the last year's profitability.

## III.

Omni employed Elmougy from 1986 until his separation on January 11, 2002. Elmougy was an at-will employee, meaning he could quit or be discharged at any time and for any reason. Over his 15-plus years with Omni, Elmougy worked at Omni hotels in five different cities. On or about November 13, 2000, while working as GM of the Omni Park West in Farmers Branch, Texas, Omni promoted Elmougy to the position of GM of the Mandalay. The Mandalay, as one of Omni's flagship hotels, is a larger, more prestigious hotel than the Park West. The Mandalay appeals to a wider range of guests. When Elmougy took over the Mandalay, an experienced management team was already in place there.

The decision to promote Elmougy to GM of the Mandalay was made and/or approved by Scartozzi (Senior Vice President of Operations); Jim Caldwell ("Caldwell"), President; Mike Dietemeyer (Dietemeyer"), Chief Operating Officer; Joy Rothschild ("Rothchild"), Senior Vice President of Human Resources; and Bob Rowling ("Rowling"), Owner and Chairman of the Board of TRT Holdings, Inc.

As GM of the Mandalay, Elmougy reported to Scartozzi. A number of other GMs reported to Scartozzi as well. Elmougy's EC at the Mandalay included Tom Harrison ("Harrison"), Hotel Manager; Patty Cipoletti ("Cipoletti"), Director of Sales and Marketing; Fawaz Salaam ("Salaam"), Director of Food and Beverage; Joe Holland ("Holland"), Controller; Faren Ardis ("Ardis"), Director of Engineering; and Ruby Goodwin ("Goodwin"), Director of Human Resources. Later, Linda Bryan ("Bryan") became Director of Human Resources. In early August 2001, Salaam left the Omni Mandalay.

# **IV**.

In 2000, Omni renovated the Mandalay's restaurant and converted it to an upscale, Italian-style restaurant named Trevi's. In January 2001, Scartozzi spoke with Elmougy and Salaam, asking them to make certain that Trevi's opening was successful. Trevi's new menu, in Italian and English, featured specials for the wait staff to present to the guests. During the soft opening of Trevi's,[2] Scartozzi observed that the service levels were not acceptable. The service was slow and the presentation of the menu was not satisfactory. Scartozzi had difficulty communicating with the wait staff. His complaint was not based on the servers' accents or national origins. Rather, he questioned their ability to converse with the guests about the menu and what the guests wished to order.

When Scartozzi discussed the problems that he had observed with Salaam, Salaam told him that the lack of proper service was due to budget constraints. Scartozzi told Salaam to pay whatever it took for a wait staff that could serve properly. He told Salaam and Elmougy to conduct training for the wait staff. Rather than address the communication issues or provide training, Salaam's solution was to avoid Corporate complaints by assigning a server with good communication skills to serve Corporate guests.

In late December, Caldwell also experienced problems while he was dining at the newly opened Trevi's. Caldwell's goal was to turn a run-of-the-mill hotel restaurant into a fine Italian restaurant that would attract local patrons. Caldwell was served by wait staff who could not properly communicate with him and his guests. Caldwell requested that Elmougy fix the problem by retraining the wait staff to effectively communicate with patrons or by reassigning staff who had

---

[2] The soft opening was the trial period before the formal opening.

difficulty communicating and placing them in other departments with less customer interaction, such as catering or banquet. Elmougy misunderstood Caldwell's directions, jumping to the conclusion that he was to fire the Moroccan and Hispanic waiters and replace them with Caucasians. Elmougy told Caldwell, "I don't think this is a good, ethical or legal thing to do . . . ." Caldwell never told Elmougy to discriminate against the wait staff in Trevi's. Caldwell was not upset about anything Elmougy said during their conversation and did not interpret Elmougy's remarks to be a suggestion that Caldwell was suggesting illegal discrimination. Caldwell did not know the national origins of the wait persons who needed more training. Further, according to Elmougy, Caldwell never treated him unfairly throughout his employment and was always honest and decent in his dealings with him.

Elmougy did not follow Omni's instructions to conduct wait staff training in early 2001. Rather, Rothchild crafted a plan to make the wait staff successful. She conducted "Moments of Service" training in July. After the training, Omni did not experience any more problems with Trevi's. No one had any more complaints about the Trevi's staff.

The Court has considered the EEOC's administrative determination that Elmougy "refused to implement discriminatory job assignment practices prescribed by [Omni]." (Pl.'s Ex/ 27.) The Court assigns little, if any, weight to the administrative determination after considering all of the evidence at trial and the credibility of the witnesses. Scartozzi and Caldwell are credible witnesses. The Court has no reason to doubt their testimony about their conversations with Salaam and Elmougy about the Trevi's wait staff. The preponderance of the evidence at trial establishes that Omni did not prescribe discriminatory job assignment practices and did not instruct Salaam or Elmougy to implement discriminatory job assignment practices. Elmougy's perceptions about his instructions resulted from his own misunderstandings or misinterpretations of what he was told. His

response to Caldwell was vague and could not be interpreted as a refusal to implement discriminatory job assignment practices. Further, Omni took no actions that were adverse to Elmougy as a result of the conversations about Trevi's.

<u>**V**</u>.

When Scartozzi recommended promoting Elmougy to the Omni Mandalay in January 2001, he knew that Holland, in particular, would have problems with Elmougy's management style. Scartozzi counted on the fact that after two to three months, personnel issues under a new GM usually resolved themselves. Scartozzi became concerned in March when the employees were still "not warming up" to Elmougy. Issues continued to arise. Scartozzi described the attitude at the Mandalay in the spring and summer of 2001 as a defeatist morale, rather than the cheerleading atmosphere that he expected. Scartozzi had many conversations with Elmougy about this problem. Elmougy defended himself to Scartozzi. Scartozzi was a big supporter and friend of Elmougy and gave him the benefit of the doubt. Scartozzi testified, however, that the problems never went away. Scartozzi communicated the problems to Dietemeyer, but Dietemeyer let Scartozzi handle them. Scartozzi continued to believe that Elmougy would solve his problems. Scartozzi's policy with all GMs under his supervision, as with Elmougy, was to discuss problems with them directly rather than putting comments in writing or in their personnel files.

Financially, the Mandalay had a significant drop in revenue and profits in 2001. At the end of January 2001, the hotel missed its pre-sale goal by over 1,700 room-nights booked, and it lost market share. Corporate concern was immediate, and it began closely examining the sales effort at the Mandalay.

At Omni, the corporate sales team directly participates in sales meetings with the hotel sales

staff and provides corporate direction and preferences in all aspects of sales and marketing. The function of the corporate sales team is to monitor the performance of the hotel and assist the GM and hotel Sales Managers to ensure the proper sales strategies and market analysis are in place and working at any given time. Competitive room pricing is part of the expertise the corporate sales team offered.

In February 2001, Scartozzi scheduled various lunches with Mike Sullivan, the Regional Director of Sales and Marketing, Elmougy, and Elmougy's Sales Director, Cipoletti. The Mandalay was facing serious challenges related to occupancy and revenue production. Scartozzi had concerns regarding the direction and management of the Mandalay's sales function. Sullivan and Ken Gifford ("Gifford"), Corporate Director of Revenue Management, held a revenue merchandising meeting at the Mandalay to discuss ways for the hotel to improve revenue performance, including repositioning the hotel's rate structure to drive revenues. The meeting did not go well because Elmougy resisted Corporate involvement. Rather than accept the advice and directives of the corporate sales team, Elmougy disagreed with their suggestions and construed their efforts as an attempt to run the Mandalay. Elmougy immediately called Scartozzi. Elmougy voiced his displeasure and demanded his independence to oversee the sales function of the hotel without any Corporate interference. Scartozzi told Sullivan to give Elmougy autonomy in directing the Mandalay sales strategy.

In March, April, May, and June, the Mandalay's share of the available market continued to shrink, revenues declined, and revenue projections from pre-sales (booking pace) continued to weaken. At various Board meetings, which were held on the third Tuesday of each month, Rowling questioned Scartozzi about the Mandalay. In April 2001, Rowling asked Scartozzi if Elmougy was

capable of handling the problems. The Star Reports, profit and loss statements, and booking pace showed that Elmougy was not achieving the goals that had been set for the Mandalay. At that time, Scartozzi defended Elmougy and pacified Corporate's concerns about Elmougy. By June 2001, booking pace was 9,000 room nights short of its pre-sales goal, and down almost 5,000 pre-sold room-nights as compared to June of the previous year. Year-to-date, the Mandalay was six of six in its competitive set in the change of its RevPar ranking against the index[3] on a percentage basis (as compared to three of six in the previous year). EBITDA had declined dramatically as well, more than $2,000,000 as compared to June of the previous year.

Elmougy's autonomy over the Mandalay sales continued until June 27, 2001, when a sales meeting was held with representatives from Corporate and from the Mandalay. Elmougy, his E.C., Tom Chevin, Gifford, Sullivan, Dietemeyer and Scartozzi jointly agreed that the sales direction needed to change. They recognized the need to develop critical plans to improve sales performance at the Mandalay. This meeting resulted in several planned steps, including reducing the pricing structure and reorganizing the sales team to drive the revenue more effectively. Elmougy, however, insisted on maintaining control and direction of the sales effort, although he offered no proposal of his own to turn around sales performance. Scartozzi prevailed on senior management to accede to Elmougy's demand. At that time, Elmougy was concerned about the sudden financial decline of the hotel compared to its competitors, and he understood Corporate's concern regarding sales, revenues and the Mandalay's financial condition.

In August 2001, Scartozzi called Elmougy and his team to come to Corporate for a formal

---

[3] "Index" represents the fair share of the market a hotel is receiving as compared to competitive set. An index of 100 means a hotel is receiving its fair share. An index below 100 means it is receiving less.

review of the July profit and loss statement.  At the time, the Mandalay was well below the previous year's revenue and booking pace, and pre-sales appeared to be worsening, rather than improving, as desired by senior management.  RevPar since February 2001 was worse for every single month compared to the same months in the previous year, and EBITDA continued to fall.  By the end of August, before the effects from the terrorist attack on the World Trade Center ("9/11")  impacted the hotel industry, the numbers for the Mandalay were unacceptable.  Booking pace was behind goal by more than 8,000 room nights.  Total room-night revenue that was booked for the next six months was more than $1,100,000 less than it had been the previous August.  These numbers revealed that the remainder of the year 2001 and 2002 as well were shaping up to be very poor.  EBITDA had dropped dramatically from approximately $7.4M in August 2000 to approximately $4.6M – a reduction of 38%.  Similarly, year-to-date, the Mandalay was last in its competitive set in the percentage change of its RevPar index (six of six as compared to three of six in the previous year), and its RevPar index change was in the bottom five (5) Omni-owned hotels in the Omni chain.  The Mandalay was the only Omni Tier 1 hotel at the bottom.  Scartozzi told Elmougy to get his expenses in line.  He explained the pressure he was receiving from Corporate to get the Mandalay turned around.

## **VI**.

In late August 2001, Scartozzi finally decided, based on the financial outlook, that he must allow Corporate to resume its role in overseeing and assisting with sales at the Mandalay—on a temporary basis—to try and turn the hotel's performance around.  Before he could convey his decision to Elmougy, the 9/11 attacks on the World Trade Center occurred, and the hotel industry suffered an immediate setback from cancellations and curtailed travel.  For a period of time after the

attacks, Omni focused on company-wide emergency initiatives, like keeping group business and revising company policies on cancellations.

**VII**.

From early 2000 until sometime in 2002, Elmougy served first as President, then Chairman, of the Dallas/Fort Worth Chapter of the Council on American-Islamic Relations ("CAIR"). In the weeks following 9/11, Elmougy participated in interviews with local news media, including radio, television and newspaper reporters. The interviews covered topics regarding Muslims and the Muslim faith in the wake of the terrorist attacks, including one with the Dallas Morning News for a newspaper article printed on September 16, 2001, which quoted Elmougy and identified him as the GM of the Omni Mandalay.

Following a rash of crimes and threats directed towards area mosques and apprehension expressed by at least one employee, senior management at Omni became concerned that someone would retaliate against Elmougy or others at his place of business, which had been identified, along with his job title, in the course of publicly expressing his views. Because national tensions and fears were high during the several weeks following the 9/11 attacks, corporate representatives did not want the Omni name in the press or mentioned in connection with any public views expressed about the attacks, regardless of the content of the views.

To ensure a lawful and fair handling of the situation, Omni General Counsel Mike Smith and Joy Rothschild consulted with outside counsel before speaking with Elmougy. Counsel advised it was appropriate to request that Elmougy not mention Omni while speaking publicly about anything related to 9/11, while emphasizing his freedom to engage in public speaking on any topic. On September 19, 2001, Rothschild called Elmougy and told him that Mike Dietemeyer had relayed to

13

her concerns expressed by one or more employees about safety in light of Elmougy's visibility in the media and his association of his views with Omni in the September 16, 2001 Dallas Morning News article. Rothschild emphasized to Elmougy that Omni respected his right to express his views as an Islamic community leader, but cautioned him not to use Omni as a platform for his views and to be sensitive to the safety and security of his associates by not mentioning the hotel or his job there in his public interviews. Not long after this conversation, Rothschild learned that Elmougy scheduled a meeting at the Park West hotel between federal law enforcement officials, Islamic religious leaders, and representatives of area Mosques to discuss post-9/11 security measures, an event that drew media coverage. She also learned that Elmougy had spoken at a Texas Hotel/Motel Association meeting that he was attending in his Omni capacity. Rothschild and Smith met with Elmougy on September 25, 2001, to make sure that he understood the message from Rothschild's previous conversation with him, Omni's concerns, and its expectations. They asked Elmougy to distance his job and capacity at Omni from any public speaking on the events of 9/11, to hold meetings at other locations at which he planned to speak, and to take extra precautions with regard to Omni Hotels and their customers. They told him their concerns had nothing to do with his religion; rather, they related to safety, security, and not infusing the Omni name into the news. Elmougy became upset and questioned whether they were trying to get him to resign. Rothschild assured him that Omni had no such intentions.

Rothschild and Smith took no disciplinary action against Elmougy, and the meeting was not a disciplinary counseling session. A preponderance of the evidence shows that Rothschild and Smith never told Elmougy he could not speak publicly in his capacity as Chairman of CAIR or participate in CAIR activities. Indeed, Elmougy was told he had every right to participate in such

activities. Rothschild informed Caldwell that Elmougy became upset during the meeting with her and Smith. Caldwell saw no reason for Elmougy to be upset, so the next day, September 26, 2001, Caldwell went to Elmougy's office to make sure he was okay and understood the message. Elmougy expressed what a tough time the weeks following 9/11 had been for his family, and then offered to resign if Rowling no longer wanted him at the hotel. Caldwell told Elmougy that they were proud of him and assured him no one wanted him to resign. Caldwell also told Elmougy that he respected his views and his right to express them off company time. He reiterated to Elmougy, however, that Elmougy needed to avoid public association with Omni out of concern for the safety of the employees and the well-being of the hotel.

During that conversation, Elmougy told Caldwell he was considering buying a small hotel property for his wife to run. Elmougy identified the property, in Allen, Texas, as the AmeriHost Inn. Caldwell said he would check on whether that would be a conflict for Elmougy. They ended their visit with Caldwell hugging Elmougy and encouraging him. The conversation was friendly and Elmougy considered Caldwell to be a father-figure.

The September 26, 2001 conversation with Caldwell was the last conversation Elmougy had with an Omni employee about his public speaking. Elmougy continued his public speaking and appeared in additional newspaper articles discussing the Muslim faith. Omni was not mentioned. No one at Omni said anything negative to him about these activities or articles. Elmougy did not turn down any speaking opportunities or invitations after he was counseled.

## VIII.

In mid-November Scartozzi implemented the plan he had conceived late in August 2001. Scartozzi asked the corporate sales team to develop steps for Elmougy to take to improve sales.

Scartozzi approved the steps that Sullivan was scheduled to present to Elmougy. (Def.'s Ex. 9.) Scartozzi informed Elmougy of the decision to let Sullivan resume direction over the Mandalay's sales for a temporary period of six (6) weeks. Corporate hoped to jump-start sales efforts and the group booking pace. The steps were not extraordinary considering the hotel's position. Elmougy's way had not worked for nine months, and now Scartozzi felt it was time to try a new plan for six weeks. This temporary change did not affect Elmougy's pay or any other duties that he performed. Because Elmougy had been so resistant to Corporate direction previously, Sullivan instructed Elmougy not to attend sales meetings or to otherwise infuse himself in the sales direction of the Mandalay during this period, with one exception. A recognized sales technique was for a GM to pay special attention to the meeting planners and customers. Sullivan asked Elmougy to maintain contact with the customers who were booking the hotel to enhance the Mandalay's relationship with its group sales customers.

Elmougy immediately called Scartozzi to complain about the new plan, blaming Sullivan for excluding him. Scartozzi explained to Elmougy that the directions came from Scartozzi. Scartozzi asked Elmougy to embrace the plan and help both Scartozzi and Elmougy. Elmougy stated that he disagreed with the plan but would nevertheless cooperate. The origination and implementation of the plan had nothing to do with Elmougy's national origin, religion, or the wait staff at Trevi's.

In evaluating the Mandalay's performance under Elmougy, Corporate focused on the trends taking place over year 2001, excluding the month of September. The trend report reflected a negative trend in market share for every month except one. Further, the Mandalay entered the year even on group pace, but as the year progressed, it fell substantially behind. Corporate officials deemed the Mandalay's performance to be outside the norm. During the year that Elmougy

managed the Mandalay, the hotel went from a profit of $10,384,000 to $5,571,000.

## **IX**.

Scartozzi became aware of reports that the Mandalay's management team was dissatisfied with Elmougy. Scartozzi had received similar complaints about Elmougy when he became General Manager of the Park West, but at the Park West, Elmougy ultimately succeeded in garnering the support of his managers. In light of this past experience, Scartozzi believed that the initial reports from the Mandalay were part of Elmougy's acclimation period, and that his relationships would improve. Before September 11, 2001, Caldwell, Rothschild, Scartozzi and others counseled Elmougy about his management style and employee concerns. Some employees, including Michelle French, Executive Housekeeper, Jzacqu Sellers, Human Resource Manager, and Angela Genaro, Employment Manager, quit their employment at the Mandalay because they did not wish to work under Elmougy. The Human Resource Manager, Jzacqu Sellers, reported that she was resigning because of Elmougy and that he spoke to her in a derogatory manner. A Human Resources Leader in Development, Angela Genaro, resigned in September 2001 and reported that she had received complaints from more than a half-dozen people about Elmougy's management style. Additionally, Genaro testified that she had personally observed Elmougy make humiliating remarks to employees. She reported that she passed the employee complaints along to Bryant, the next in her chain of command, but received no feedback from Bryant. Elmougy forwarded an e-mail to Rothchild in which he admitted that he called Cynthia Jacob into his office and said, "What good are you to me when you can't produce a forecast while your boss is absent!" (Def.'s Ex. 16.)

In early December 2001, Scartozzi attended an awards ceremony at the Mandalay honoring the Mandalay's Chief Director of Engineering, Faren Ardis. Scartozzi had hired Ardis at the

Mandalay when Scartozzi was its GM, and he respected Ardis as a key employee. At the ceremony, Ardis received an award as Omni's Best Director of Engineering in 2001. Scartozzi attended the ceremony and noticed that the tenor of the awards ceremony was very somber. Scartozzi met with Ardis afterward to ask what had happened. Ardis was emotional and told Scartozzi that he was unhappy and would most likely be leaving Omni. Ardis also reported that several EC members and managers were unhappy working with Elmougy and were planning to leave the organization. Ardis expressed concerns about Elmougy's outside activities, not because of Elmougy's national origin or religion, but because Ardis was worried that Elmougy was not present on the Mandalay property running the hotel enough of the time. Scartozzi knew Ardis well and had no reason to doubt Ardis' concerns and reports of the employee morale at the Mandalay.

## **X**.

Scartozzi concluded soon after his conversation with Ardis that Elmougy should be transferred to another hotel. Omni terminated at least three GMs in the twelve months preceding and following Elmougy's separation for failures in sales and/or low morale. However, Scartozzi did not think that Omni should give up on Elmougy, but should offer him an opportunity where he could improve the deficiencies that had become apparent at the Mandalay. At the Park West, Elmougy achieved budget every year and acquired four-diamond status for the hotel. He was extremely successful in balancing the trilogy, with a REVPAR 12 month average of over 100%, the fifth lowest customer complaints per 10,000 rooms, and one of the highest Associate Opinion surveys in the chain. Although Elmougy had been extremely successful in balancing the trilogy at the Park West, at the Mandalay, Elmougy failed to satisfy two of the three parts of the trilogy: (1) owners and associates– with failures in sales and the financial decline; and (2) employees – the reported low

morale and loss of confidence among EC and other managers. With regard to the latter, Scartozzi felt that enough time had passed for EC and management to acclimate to Elmougy if it were going to happen. Realizing that morale was not going to improve, Scartozzi felt that Elmougy could benefit from some mentoring in the area of his management style. The first part of December 2001 and about one week after his conversation with Ardis, Scartozzi approached Dietemeyer and suggested that they remove Elmougy from the Mandalay and offer him an open GM position at the Omni Shoreham in Washington, D.C., another flagship Omni property.

In 2001, the Shoreham was one of Omni's largest and most prestigious properties. The Shoreham is a historic hotel located on eleven acres in the heart of Washington D.C. The Shoreham regularly hosts Presidential inaugural balls and is the owner's favorite property. Omni had recently renovated the hotel, investing millions of dollars in it. The hotel had twice as many rooms as the Mandalay, three times the meeting space, almost twice as many employees, and it generated the most revenue and profit of any Omni hotel. The Shoreham is a member of "Resorts and Great Hotels of the World," and many of its guests are celebrities, diplomats and politicians.

Scartozzi believed that the Shoreham would be a good opportunity for Elmougy. Peter Austin, whom Omni considered to be one of its best leaders, could mentor Elmougy and help him improve his management skills. Furthermore, the Shoreham was unionized, and the management was highly structured. Austin was one of several GMs being promoted to Area Director for several properties, a new Omni position, and had been recognized for excellent employee relations and leadership. Although Austin's office was located at the Shoreham, Elmougy's daily job duties and the responsibilities of the GM position would not change. When the Area Director positions were announced at the beginning of January 2002, Austin was slated to oversee the Mandalay; therefore,

Elmougy would have reported to Austin even if he had remained as GM at the Mandalay. The Shoreham opportunity would not have resulted in a reduction in pay and was considered by Corporate to be a promotion. The only substantive change in the job was the location (Washington, D.C.).

Dietemeyer and Caldwell approved Scartozzi's recommendation. During this process, there were no discussions about severance, termination, or alternative jobs for Elmougy, because they believed Elmougy would accept the Shoreham job. They agreed the Shoreham was a great opportunity for him.

Scartozzi worked for Omni for fifteen years. His job was to make property visits to the hotels and supervise the GM's. He hired, promoted, transferred, and fired GM's for failure to perform. The Court finds Scartozzi to be a credible witness. Scartozzi knew that Elmougy was an Arab, was born in Egypt, and was a Muslim. Scartozzi had a personal relationship and friendship with Elmougy. EEOC claims that a joke e-mail from Scartozzi to Elmougy establishes animus. Elmougy testified that Scartozzi was a jokester who was always forwarding e-mail jokes. Elmougy testified that he received a September 28, 2001 e-mail from Scartozzi about not wearing a turban in the Mandalay lobby. In the joke, Scartozzi referred to himself as the "head wop." Scartozzi was Elmougy's friend and thought the e-mail would lighten the mood and make him laugh. Elmougy did not wear a turban at all, so he did not interpret the e-mail as anything other than a joke. He did not complain about it. Elmougy testified he does not believe Scartozzi harbored any animosity toward him based on his national origin or religion. Considering the e-mail's tone and the spirit in which it was sent, it was nothing more than an attempt at a joke. The joke is not indicative of discriminatory animus on Scartozzi's part and it did not play any part in Scartozzi's decision making

process concerning Elmougy's job at the Mandalay. Quite the contrary, Scartozzi respected Elmougy and wanted him to succeed. Scartozzi protected Elmougy and tried to give him the best opportunities, always considering Elmougy's best interests. The Court finds that Scartozzi testified truthfully that Elmougy's national origin and religion never played a role in any decision that Scartozzi made concerning Elmougy.

When Scartozzi offered Elmougy a transfer from the Park West to the Omni Mandalay, Elmougy accepted and negotiated his salary with Scartozzi. Scartozzi's history of managing and negotiating with Elmougy led him to conclude that Elmougy never accepted Scartozzi's first offer. As a result of their negotiations, Elmougy usually obtained the salary that he wanted. Scartozzi reasonably believed that Elmougy would negotiate the salary he wanted and transfer to the Shoreham.

Scartozzi met with Elmougy on December 18, 2001, to informed him of the decision. Scartozzi stressed that the GM position at the Shoreham was a good opportunity and that Elmougy would benefit from working closely with Peter Austin. Scartozzi emphasized that Elmougy would be the General Manager, responsible for all daily operations at the hotel. Elmougy only asked Scartozzi about the job responsibilities and salary. Elmougy told Scartozzi he could not take the position because his father was dying and he was about to purchase a hotel in Allen, Texas for his wife to run, stating it would be virtually impossible for him to leave Dallas. Scartozzi did not know that Elmougy's father was dying until Scartozzi told him that day. Nor did he know that Elmougy intended to purchase a hotel. Elmougy never made Caldwell and Dietemeyer aware of the seriousness of his father's illness. Caldwell testified that Omni made accommodations for employees who had family hardships. Elmougy did not inquire about such an option.

Elmougy told Caldwell in an earlier conversation and represented to this Court that he was purchasing a 60-room motel for his wife to run. In fact, after spending time during his last three months of employment with Omni attending to details regarding the creating of the Pyramids entities and the purchase of the hotel, Elmougy incorporated Pyramids Hospitality, Inc. on December 4, 2001, two weeks before Scartozzi's conversation about the transfer. (Def.'s Ex. 31.) Pyramids Hospitality, Inc. is a full service hotel development and management company formed in December 2001 to acquire and manage leading brand mid-priced hotel properties rated three diamonds by the American Automobile Association ("AAA"). (Def.'s Ex. 32, 33.) Pyramids Hotel, located in Allen, Texas is not a motel, as Elmougy represented to the Court. Rather, it is a "Boutique Hotel" which encompasses luxuries found only in full-service hotels.[4] (Def.'s Ex. 33.) In an interview for the Dallas Business Journal in January 2002, Elmougy was quoted as saying, "It is every hotel operator's dream to become an owner." (Def.'s Ex. 30).

Elmougy told Scartozzi he was going on a two-week vacation to close on the purchase of the hotel he was buying for his wife and he wanted that time to think about Omni's offer to transfer him to the Shoreham. Scartozzi agreed and gave him until December 28, 2001 to decide. Afterwards, Elmougy did not seek clarification from Scartozzi or anyone else at Corporate about the Shoreham position, the availability of any other position within Omni, or the possibility of delaying the transfer. Elmougy decided his personal circumstances precluded him from moving, and he was unwilling to accept the Shoreham position.

---

[4] Elmougy and his immediate family own the Pyramids Hotel. Elmougy worked at the hotel, on average, 60 hours a week during 2002-2004 and 50 hours a week thereafter. He has been involved in a renovation of the Pyramids Hotel and many other aspects of its operations, as well as the formation of an Allen, Texas, hotel association.

## XI.

Elmougy left Scartozzi a voice mail on December 28, 2001, advising he had retained a lawyer and was going to let the attorneys handle matters. That same day, Elmougy's attorney sent a letter to Omni's General Counsel, Mike Smith, stating Elmougy could no longer work for Omni and proposing a severance package. In a response letter to Elmougy's lawyer dated January 3, 2002, Smith confirmed the job offer at the Shoreham would remain open until January 11, 2002 and in the meantime, Elmougy would be on a paid leave of absence. Smith emphasized the value Omni placed on the position it was offering Elmougy and confirmed Elmougy would not experience a reduction in his pay.

Elmougy did not accept the GM position at the Shoreham and made no alternative job requests, asking only for a severance payment. Therefore, when the deadline for his response expired on January 11, 2002, Omni considered that Elmougy had resigned. Beginning in January 2002, Elmougy worked, and still works, forty to sixty hours per week at the hotel he, his wife, and children purchased, the Pyramids Hotel in Allen, Texas. Elmougy's wife draws a salary and he, his wife, and children receive the profits, amounting to $178,000 in 2005 and $148,000 in 2006.

After an interim during which Omni searched for a new GM, Omni appointed John Russell "Rusty" Wallace ("Wallace") as GM of the Mandalay. Wallace was not an Arab, was not born in Egypt, and was not a Muslim.

## XII.

Within Omni and the hotel industry in general, it is routine for managers, including high-level GMs, to move from one hotel property to another. Omni averages an estimated six GM transfers per year. In short, Omni sends GMs where it needs them and where it thinks they will

succeed.  On some occasions, Omni must give a GM very little notice of a transfer.  Harrison, for example, received two or three days notice of his transfer from the Omni Mandalay to the Omni Severin.  Elmougy worked in multiple hotels and transferred to and from five different cities during his career at Omni.  In 1999 Elmougy noted a desire to remain in Dallas on a Planning Worksheet, but the worksheet had no binding effect on his transferability.  Transfer decisions were made based on Omni's business needs, not upon an employee's personal wishes.  No credible evidence shows that Scartozzi was aware of the worksheet or the fact that Elmougy's father was extremely ill when he made to decision to transfer Elmougy  to the Shoreham.

## XIII.

Omni's regular practice is to discharge a GM who is performing poorly.  Because GMs are responsible for the operation of an entire hotel property, Omni must have trust and confidence in a GM to allow the person to remain in the position.  As a result, Omni does not typically "write-up" a GM for performance and place such a document in the GM's file.  If Omni has concerns with a GM, it typically discusses them with the GM.  If performance fails and it loses confidence in the GM, Omni discharges the GM.

Omni's offer to transfer Elmougy to the Shoreham rather than discharge him was considered unusual because of the serious concerns about Elmougy's performance at the Mandalay.  No other Omni GM received a transfer opportunity following performance as poor as Elmougy's at the Mandalay.  Omni discharged other GMs with poor sales and/or poor employee relations.  In the twelve months before and after Elmougy's separation, Omni terminated non-Muslim, non-Egyptian GMs without prior written warning: (a) Mike Knapp, GM of the Omni Los Angeles, April 9, 2001, for poor sales (RevPar index change in the bottom five (5) hotels of the Omni chain at the time of

separation); (b) Paul Martin, GM of the Omni Severin in Indianapolis, April 30, 2002, for low morale and lagging sales (RevPar index change above the bottom five hotels of the Omni chain at the time of separation); and (c) David Rijos, GM of the Omni Charlotte, July 30, 2001, for poor guest and employee satisfaction. None of these individuals had "write-ups" in their personnel files prior to their discharge.

**XIV**.

Prior to the terrorist attacks on 9/11, Elmougy did not experience what he considered to be any animosity at Omni based on his Egyptian origin or Islamic faith. Throughout his employment, and even after 9/11, Omni accommodated Elmougy's faith by permitting him to attend religious services during the work day on Fridays. EEOC and Elmougy offer no evidence from which the trier of fact can infer, that Scartozzi, Dietemeyer, Rothchild, Smith, or Rowling ever harbored or exhibited animosity towards Elmougy based on his national origin or religion or made any decision concerning any aspect of Elmougy's employment based upon Elmougy's Egyptian origin or Islamic faith. Omni selected Hossein (Paul) Maher, a Muslim who was born in Iran, as its GM of the Year in 2001. EEOC's and Elmougy's suggestion that the selection was a sham to cover up discrimination against Elmougy, a Muslim, is totally without merit. The record contains not one shred of credible evidence from which the Court can infer that Omni's selection of Maher for his prestigious award was based upon anything other than merit.

**CONCLUSIONS OF LAW**

**I**.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms,

25

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.§ 2000e-2(a)(1). This court applies the burden shifting framework utilized by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973), to analyze EEOC's and Elmougy's claims of discrimination and retaliation. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).

The framework is well known: The plaintiff must establish first a *prima facie* case of discrimination; if he is successful, the defendant then must articulate some legitimate, nondiscriminatory reason for the challenged employment action; and finally, if the defendant is successful, the inference of discrimination raised by the *prima facie* case disappears. *Walton v. Bisco Industries, Inc.,* 119 F.3d 368, 370 (5th Cir.1997). The plaintiff then must prove, by a preponderance of the evidence, both that the defendant's articulated reason is false and that the defendant intentionally discriminated. *Id.*

To establish a *prima facie* case of national origin and religious discrimination under Title VII, a plaintiff must show that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." *Okoye v. Univ. of Texas Houston*, 245 F.3d 507, 512-13 (5th Cir. 2001) (internal quotation marks omitted).

The anti-discrimination statutes were "designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995). Elmougy's

26

first claim, that Omni "removed" his sales responsibilities for six weeks because of his religion (to wit: he is Muslim and participated in Muslim-related activities) and national origin (Egyptian), does not address an ultimate employment decision. A preponderance of the evidence shows that Omni simply allowed the Corporate sales team to resume its customary, more active role in overseeing and directing sales at the Mandalay after the failure of its earlier attempt to let Elmougy proceed without corporate assistance. The Court finds that no formal transfer of sales responsibility occurred when the Corporate sales team resumed its oversight of sales at the Mandalay. Moreover, Elmougy agreed with Scartozzi to let the Corporate sales team assume a greater role at the Mandalay, and the Corporate involvement did not affect Elmougy's pay, benefits, or any other term or condition of employment. Accordingly, EEOC and Elmougy failed to prove that Elmougy suffered an adverse employment actions with respect to Elmougy's sales responsibilities at the Omni.

Similarly, Omni's request that Elmougy keep Omni's name out of any public speeches or media interviews about 9/11 had no effect on his employment terms or treatment. Contrary to Elmougy's sworn statement to the EEOC, Omni did not tell Elmougy not to speak in public on behalf of the local Muslim community after September 11, 2001. To the contrary, Omni specifically instructed Elmougy that he had every right to speak. In fact, Elmougy continued to speak, and the record is devoid of evidence that the terms and conditions of his employment changed as a reult of the September 18, 2001 discussion, the last time the matter was every mentioned.

EEOC and Elmougy claim that Omni constructively discharged Elmougy because of his national origin and religion. The burden of proof for constructive discharge is different and more stringent than the burden of proof for establishing an adverse employment action. *See Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Constructive discharge occurs

when "the working conditions are so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980), quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). *See Jurgens v. E.E.O.C.*, 903 F.2d 386, 390 (5th Cir. 1990); *see also Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 751-52 (5th Cir. 1986), *aff'd in part and remanded in part on other grounds*, 491 U.S. 701 (1989).

In *Jett,* a high school athletic director/ head football coach was transferred to a different high school and demoted to freshman football coach. *See id.* at 751-52. The transfer, which followed a month-long public dispute between the coach and his high school principal, prompted the coach to "resign from the public education field with much sorrow and humiliation." *Id.* at 755. The coach sued his former principal and school district, and a jury found that the coach had been constructively discharged for racially discriminatory reasons. *See id.* at 752. The Fifth Circuit Court of Appeals reversed on the ground that, as a matter of law, the coach had not been constructively discharged. Noting that although "a demotion or transfer in some instances may constitute constructive discharge, " the coach's loss of responsibility "was not so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 755.

One factor the Fifth Circuit considers important is deciding what a reasonable person would do is whether a plaintiff has options other than resigning. *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) (holding that a reasonable employee who genuinely felt working conditions were so upsetting to the point of intolerable would have attempted resolution of concerns before choosing to quit after just two weeks back on the job); *see also Boze v. Branstetter*, 912 F.2d 801, 805-06 (5th Cir. 1990) (affirming summary judgment for employer because resigning

employee, who suffered a poor performance evaluation and reduced job responsibilities, had other options, such as pursuing an internal grievance process, before quitting). Another factor courts must consider is whether a proposed transfer, even out-of-state, is a routine practice in the employer company. *See Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983) (transfer to Jackson, a location more inconvenient to plaintiff's husband's home in Arkansas than Shreveport or the Arkansas stores, where such transfers were standard K-Mart policy and the transfer was not unusual, unreasonable, or in any way motivated by race or sex).

Elmougy was accustomed to and understood the need for transfers in the hotel industry. He had worked for Omni in five different cities during his career. Moreover, the Shoreham opportunity afforded the same pay, benefits, title, and responsibilities to Elmougy. As such, the proposed transfer was not so intolerable that a reasonable person in Elmougy's position would have felt compelled to resign. *See Barrow*, 10 F.3d at 297. Elmougy's only work-related complaint about the job is that he would have been reporting to someone else, Area Director Peter Austin, who would have been located at his property. A change in supervisors does not, by itself, equate to constructive discharge. *See McCann v. Litton Sys., Inc*., 986 F.2d 946, 952 (5th Cir. 1993) (court held option of retiring or receiving a transfer to undefined position with 12% pay cut, decrease in job responsibilities, and change in supervisors does not constitute a constructive discharge as a matter of law). Moreover, as Area Director, Austin was slated to oversee the Mandalay beginning in January. Therefore, even if Elmougy had remained at the Mandalay, he would have reported to Peter Austin. As a matter of law, this change is not so intolerable or so unexpected in the hotel industry that it would justify Elmougy's decision to leave Omni rather than transfer to the Shoreham.

The law will not hold an employer accountable for constructive discharge when factors

personal to the employee and unrelated to the job at issue cause him to refuse a transfer. *See, e.g.*, *Smith v. Goodyear Tire & Rubber Co.,* 895 F.2d 467, 472-73 (8th Cir. 1990) (citations omitted) (holding an employee could not show he was constructively discharged when he refused to accept a transfer because he believed he could not sell his house); *Hughes v. Alabama Dep't of Public Safety*, 994 F. Supp. 1395, 1406 (M.D. Ala. 1988) (holding an employee was not constructively discharged when he refused to accept a transfer because he and his family had lived in a town for over 22 years); *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309 (E.D. Ky. 1990) (mere subjective preferences of the plaintiff are insufficient to turn a transfer of location into a constructive discharge). Despite the Shoreham's larger size and prestige and the assurance of equivalent pay, benefits, and job duties, Elmougy chose to stay in Dallas to be near his father and to manage a recent hotel purchase, both of which are considerations personal to him and outside of Omni's control. *See Cherchi v. Mobil Oil Corp.*, 693 F. Supp. 156, 162 (D.N.J. 1998), aff'd without opinion, 865 F.2d 249 (3rd Cir. 1988) (holding as a matter of law that a plaintiff who found his reassignment at the same salary intolerable because of his perception that the transfer was to a lesser position and because of his unwillingness to relocate for personal reasons (i.e., his mother's health problems or his problems with his girlfriend and her daughter) was not constructively discharged).

Although Elmougy indicated that he was "currently unable to relocate" on a Succession Planning Worksheet in April, 1999, he failed to indicate when he would be able to relocate, as required by the questionnaire. Considering the frequency with which Omni transfers GMs and other high level employees, the Court does not find that offering Elmougy a transfer to the Shoreham was such an intolerable condition that a reasonable person would have felt compelled to resign. Elmougy could have made alternate arrangements to address his personal issues (e.g., commute to

Dallas on weekends or move his father to Washington, D.C.) rather than refuse the transfer. Many working people are responsible for elderly, and even gravely ill parents. Many workers have wives with job obligations of their own. Such employees may hope to remain settled, but the reality of the job demands in their profession may dictate otherwise. Additionally, because Elmougy refused the transfer without making a reasonable inquiry, he did not meet the duty of reasonableness required for constructive discharge.[5] Elmougy had no intention of accepting the job. Upon his return from vacation, Elmougy had his lawyer write a letter to Omni stating that Elmougy could no longer work for Omni and requesting a severance package.

EEOC and Elmougy did not meet their burden to prove a constructive discharge. EEOC and Elmougy cannot satisfy their burden of proof under *Barrow* and its progeny; therefore, his separation cannot be an adverse employment action subject to Title VII. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

## II.

Nevertheless, the Court will assume that Plaintiff established a *prima facie* case and continue its application of the law to the evidence. Where, as here, a plaintiff offers no direct evidence of discrimination or retaliation, the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp.* applies. *See St. Mary's Honor Ctr.*, 509 U.S. at 505-11; *McDonnell Douglas,* 411 U.S. at 800-05; *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305 (5th Cir.

---

[5] "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst or jump to conclusions too fast." *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 310 (5th Cir.1987) (quoting *Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987)). Elmougy asked little about the salary and title of the Shoreham position. He made no effort to find out more about the position—or even other possibilities, such as a delay in the transfer due to his father's illness—after his conversation with Scartozzi.

2004); *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).

As required by *McDonnell Douglas Corp.*, Omni has satisfied its burden of articulating legitimate, non-discriminatory reasons for (a) temporarily removing Elmougy's sales responsibilities in November 2001, and (b) removing Elmougy as GM of the Mandalay in December 2001 and offering him a transfer to the Shoreham. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Omni's burden is "one of production, not proof, and involves no credibility assessments." *West v. Nabors Drilling USA, Inc*., 330 F.3d 379, 384-85 (5th Cir. 2003).

When the employer meets this burden, the presumption of discrimination raised by . . . the *prima facie* case is rebutted and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The burden then shifts back to EEOC and Elmougy to show, "at a new level of specificity," that Omni's reasons were a pretext for discrimination. *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1164 (5th Cir. 1993).

The EEOC and Elmougy are required to offer proof to rebut each of Omni's articulated reasons. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). EEOC and Elmougy always bear the burden of "persuading the trier of fact that [Omni] intentionally discriminated" against Elmougy. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *see also Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 575 n.5 (5th Cir. 2004).

In a mixed motive case involving an employment decision based on a "mixture of legitimate and illegitimate motives," the plaintiff need only prove that the illegitimate motive was a motivating factor in the decision. *Rachid*, 376 F.3d at 310 (citations and internal quotation marks omitted). EEOC and Elmougy failed to meet their burden to demonstrate that Omni's proffered reasons were a mere pretext for discrimination and not worthy of credence, or that discrimination motivated by

Elmougy's religion, Islam, or his national origin, Egyptian, actually played a role in and had a determinative influence on Omni's employment decisions. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997); *see also Reeves*, 530 U.S. at 143 (plaintiff must produce evidence defendant's proffered reason is "false or unworthy of credence"); *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004) (to establish pretext, a plaintiff must demonstrate the falsity of his employer's explanation for the discharge).

EEOC and Elmougy offer no evidence from which the Court can infer that Omni's stated reasons for its actions were false. EEOC and Elmougy claim that Scartozzi did not mention economics in his conversation with Elmougy about the transfer. The evidence does not support this claim. In Elmougy's sworn statement to the EEOC, he affirmed under oath that Scartozzi told him he was being transferred because of economics and his management style. (Pl.'s Ex. 21.) EEOC and Elmougy also contend Omni's reasons are false because they never "wrote Elmougy up." Omni treated its GMs like the professionals that it considered them to be. "Laying a paper trail" was not the practice at Omni. Additionally, as a GM charged with the financial responsibility of operating a flagship hotel, Elmougy cannot expect the trier of fact to find, and this Court does not find, that he needed to be written up before he would know that by June 2001, booking pace was 9,000 room nights short of its pre-sales goal, and down almost 5,000 pre-sold room nights as compared to June of the previous year. The showing that at that time, year-to-date, it was six of six in its competitive set in the change of its RevPar ranking against the index[6] on a percentage basis (as compared to three

---

[6] "Index" represents the fair share of the market a hotel is receiving as compared to competitive set. An index of 100 means a hotel is receiving its fair share. An index below 100 means it is receiving less.

of six in the previous year) could not have escaped his attention. Moreover, by June, the Omni's EBITDA had declined dramatically as well, more than $2,000,000 as compared to June of the previous year.

The documentary evidence of declining sales, pre-sales, market share, revenue and profit at the Mandalay soon after his arrival that continued until the time of Omni's offer of transfer is undisputed. Nor did Elmougy credibly dispute the evidence of Corporate's genuine concern about the downward trend, concern that Omni expressed to him as early as February 2001 and continuously, both before and after 9/11, through the time Omni offered him a transfer to the Shoreham. The evidence shows that at numerous Board meetings before 9/11, these concerns were discussed. Elmougy concedes that he, as well as Corporate, was concerned about the Mandalay's economic performance.

Elmougy blames various circumstances for some of his sales failures, such as a brief renovation and the opening of a nearby Marriott. The issue is whether Omni's perception of Elmougy's performance, accurate or not, was the real reason for moving him from the Mandalay to the Shoreham. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue . . . ."). Elmougy's repeated demands for sales autonomy and resistance to Corporate involvement in his sales effort -- even after he had done poorly without corporate assistance --support Omni's good faith judgment that the Mandalay needed new leadership.

To establish a claim of disparate treatment, EEOC and Elmougy must show that Omni gave

preferential treatment to a non-Egyptian, non-Muslim employee under "nearly identical" circumstances. *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991), citing *Smith v. Wal-Mart Stores,* 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam). Elmougy's economic comparison of the Mandalay to the Omni Park West hotel (and other Omni Hotels) is misplaced because it was not a similarly-situated Tier 1 hotel, and it did not suffer the same economic changes to revenue and booking pace. Moreover, it was not losing ground to the RevPar index against its competitive set at the same percentage as the Mandalay. The Park West's GM was new to the Company, did not resist Corporate sales initiatives, and had the support of his sales team. Ultimately, Elmougy's comparison of his property's financial circumstances to that of different Omni hotel properties is unavailing. *See Wyvill v. United Life Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000).

With regard to the "associate" component of the trilogy, EEOC and Elmougy offer no evidence from which a trier of fact can infer pretext. No evidence suggests anyone in Corporate fabricated complaints regarding Elmougy's management style. The record contains no credible evidence that Ardis misled Scartozzi to harm Elmougy because of his religion and/or national origin. No credible evidence exists that others complained of Elmougy because of concerns regarding his religion or national origin. While Elmougy may have explanations as to why he considers some of the complaints from his management team unwarranted, there is no credible dispute that complaints occurred. *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("[T]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."). The credible evidence establishes that Scartozzi and

Rothschild spoke with Elmougy about employee concerns about his behavior. Scartozzi dismissed early reports as part of the acclimation process that he witnessed management experience with Elmougy at the Park West. When Ardis tearfully reported that he and other members of the EC were planning to leave the Mandalay because they no longer wanted to work under Elmougy's management, Scartozzi had a good faith belief that Elmougy had lost the confidence of his EC. *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977), *overruled in part on other grounds*, *Burdine v. Texas Dep't of Cmty. Affairs*, 647 F.2d 513 (5th Cir. 1981) (holding that employer's action based on "honest belief" that the plaintiff violated time card policy did not constitute unlawful discrimination, even if employer's belief was based on inaccurate information); *Corley v. Jackson Police Dep't*, 566 F.2d 994, 1003 n. 14 (5th Cir. 1978) ("[W]here an employer wrongly believes that an employee has violated company policy, [the employer] does not discriminate in violation of Title VII if it acts on this belief."). Previous resignations accompanied by complaints about Elmougy provide further credence to Scartozzi's good faith belief in Ardis' report.

In the absence of evidence that Omni's stated reasons were false, Elmougy's subjective opinion or disagreement with a business decision of Corporate is not sufficient to establish pretext for discrimination or retaliation. *See Walton v. Bisco Indus., Inc*., 119 F.3d 368, 372 (5th Cir. 1997) (discrimination laws are not vehicles for judicial second-guessing of business decisions); *Mayberry*, 55 F.3d at 1091 (issue is not whether employer made erroneous decision, but whether it intended to discriminate); *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001) ("This Court affords a high degree of deference to employers" in their employment decisions).

Elmougy offers no evidence of discriminatory motive. Specifically, the record lacks any

credible evidence that Scartozzi took into account Elmougy's national origin or religious faith when he temporarily reassigned the Mandalay sales function to Corporate for six weeks. On the contrary, Elmougy admits Scartozzi did not demonstrate or harbor any animus towards him based on his national origin or religion.

The record also lacks evidence from which the Court can infer that Scartozzi, Dietemeyer, Rowling, and Caldwell collaborated to discriminate against Elmougy based on national origin or religion when they decided to remove him from the Mandalay and offered him a transfer to the Shoreham, another flagship property. The credible evidence establishes that Omni's goal in transferring Elmougy was to save his employment, rather than to terminate him. Elmougy concedes his boss and others at Omni exhibited no discriminatory animus towards him and that Caldwell always treated him fairly. He offers no evidence from which the trier of fact can infer that his national origin or religion played an actual role in any decision made by Omni management.

Elmougy continued to participate without incident in CAIR-related activities after September 26, 2001, without associating himself with Omni and without receiving any expression of concern by Omni, despite the publicity of his activities. The decision to remove him from the Mandalay occurred several months later.

Moreover, the key decision-makers who hired and promoted Elmougy over his fifteen-year career at Omni (Scartozzi, Dietemeyer, Caldwell and Rowling) collaborated in the decision to transfer him from the Mandalay to the Shoreham. On September 26, 2001,Caldwell specifically declined Elmougy's offer to resign, and instead expressed support for him. When the same actors are involved, there is an inference that Elmougy's protected traits, his religion and national origin, were not the reason for any alleged adverse action. *See Brown v. CSC Logic, Inc*., 82 F.3d 651, 658

(5th Cir. 1996) ("[c]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, [i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job" (*quoting Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)) (internal quotation marks omitted)). It is illogical that Caldwell, Omni's Owner and Chairman of the Board, would have consoled Elmougy on September 26, 2001, would have offered him support, and would have rejected Elmougy offer to resign if he had planned to force Elmougy to quit in December, particularly since nothing even remotely connected to 9/11 or the Trevi's wait staff occurred between September 26 and December 18, 2001.

As evidence of Muslim discrimination, Elmougy points to Omni's request that he distance the hotel and Omni name from his public interviews on the subject of 9/11. Contrary to what he put in his EEOC charge, Elmougy now admits that Omni never asked him to refrain from speaking, to silence his views about the Islamic faith, or to cease his relationship with CAIR. Omni merely asked Elmougy not to mention the hotel or his role with Omni. Omni never disciplined Elmougy for his public activities. The record is devoid of evidence that Elmougy's religious faith, his expression of support for his faith, and his Egyptian origin motivated Omni's actions in a discriminatory fashion. Omni's honest belief in discouraging association with the Omni name for security reasons, even if incorrect, is not discrimination. *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *Mayberry*, 55 F.3d at 1091.

Elmougy's allegations of discrimination are based on nothing more than mere speculation and his own subjective beliefs. Mere speculation is insufficient to demonstrate pretext. *See Waggoner*, 987 F.2d at 1166. A plaintiff's own subjective belief of discrimination, however genuine, cannot be the basis for judicial relief. *See Little*, 924 F.2d at 96.

<u>**III**</u>.

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Burlington*, 126 S. Ct. at 2415 (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997)). The anti-retaliation provision prohibits employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Burlington*, 126 S. Ct. at 2415.

Applying the *McDonnell Douglas* framework to a plaintiff's claim of retaliation, he must make a prima facie showing that: (1) he engaged in an activity protected under Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). "A 'causal link' is established when evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co*., 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. American Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998)). The employee must have an objectively reasonable good faith belief that the practice violated Title VII. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

With respect to the first element of a retaliation claim, "[a]n employee has engaged in activity protected by Title VII if [ ] he has . . . 'opposed any practice made an unlawful employment practice' by Title VII . . . ." *Long,* 88 F.3d at 304. An adverse employment action for purposes of retaliation means an employment action that a reasonable employee would have found to be

materially adverse. *Burlington*, 126 S. Ct. at 2415. Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to show a nondiscriminatory reason for the adverse employment action. If the defendant does so, the burden of production then shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. At all times, however, the plaintiff has the ultimate burden of proof to show that unlawful retaliation was one of the reasons that the defendant subjected him to an adverse employment action.

Elmougy claims he engaged in protected activity by his response to Caldwell about the Trevi's wait staff. The Court finds from a preponderance of the evidence that Elmougy did not engage in protected activity by opposing a practice made unlawful under Title VII during his conversation with Jim Caldwell in March 2001. Elmougy's alleged opposition was either nonexistent or too vague to support a retaliation claim. Elmougy's concerns about the Trevi's wait staff, as expressed to Caldwell in March 2001, were vague. He did not elaborate as to any ethical or legal concerns he may have had and asked only to consult with human resources. Elmougy never used the term "discrimination," or otherwise suggested he was opposing a practice made illegal by Title VII. Caldwell did not react to Elmougy's response in a manner that would have discouraged Elmougy from challenging discrimination. Elmougy's belief that he was challenging discrimination was purely subjective and based on his own misunderstanding of Caldwell's directions about the Trevi's wait staff. No credible evidence exists that Caldwell used language that had double meanings (termed "Omnispeak" by EEOC and Elmougy) in his conversation with Elmougy.

Elmougy claims he engaged in protected activity when, in his September 25, 2001 conversation with Rothschild and Smith, he allegedly stated that his faith was under attack and that he felt like he was being kicked while he was down. Elmougy did not oppose a specific

discriminatory practice or raise concerns about unlawful activity by Omni; he simply expressed personal feelings of distress, during an emotionally-charged time in his life, at having to refrain from mentioning his employer in public speeches about the 9/11 attack. He did not raise legal or discriminatory concerns at any time during the meeting.

Vague concerns and even vague assertions of discrimination are not sufficient to constitute an opposition to an unlawful employment practice. *Turner v. Claims Admin. Corp.*, 993 F. Supp. 982, 989 (W.D. Tex. 1998); *Callahan v. Bancorpsouth Ins. Servs.*, 244 F. Supp. 2d 678 (S.D. Miss. 2002) (cryptic remarks regarding gender-based discrimination insufficient to constitute a protected activity); *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 823 (S.D. Tex. 1998) (Plaintiff "did not complain of any specific activity that she believed to be unlawful, nor did she accuse any specific individual of discriminating against her"); *Aldridge v. Tougaloo Coll.*, 847 F. Supp. 480, 483 (S.D. Miss. 1994) (grievance-related complaints that a job vacancy was not properly noticed and that plaintiff had been treated unfairly not protected expression under Title VII); *Primes v. Reno*, 999 F.Supp. 1007, 1016 (N.D. Ohio 1998) (vague suggestions of racism as one possible explanation of what plaintiff perceived as a poor evaluation was insufficient to constitute "opposition" under Title VII), *aff'd*, 190 F.3d 765 (6th Cir. 1999).

Additionally, EEOC and Elmougy have not demonstrated that Elmougy's remarks were in opposition to a practice that a reasonable person would find discriminatory. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 429 (5th Cir. 2000); *Kaplan v. City of Arlington*, 184 F. Supp. 2d 553, 565 (N.D. Tex. 2002). Elmougy's subjective belief that an employment practice was discriminatory is not sufficient. *See Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981); *Harvey v. Chevron U.S.A., Inc.*, 961 F. Supp. 1017, 1032 (S.D. Tex.

1997) (holding that a showing of subjective good faith alone is insufficient). With regard to the Caldwell conversation about Trevi's, nothing about Caldwell's suggestion to retrain or reassign staff suggested that those activities be carried out based on an employee's race, as opposed to the application of legitimate, neutral communication criteria. With regard to the September 25, 2001, discussion, Elmougy's admission that he perceived no animosity from Rothschild or Smith regarding his Muslim faith dispels any inference that one could objectively view their request as discriminatory.

## IV.

None of the actions alleged by EEOC and Elmougy to be adverse constitute materially-adverse actions sufficient to support a Title VII claim of retaliation under *Burlington*, 126 S. Ct. at 2415. The standard is an objective one, requiring EEOC and Elmougy to establish that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415. The materiality component is critical because it separates significant from trivial harms. *Id*. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*.

The actions that Elmougy complains resulted from alleged retaliation are increased corporate sales scrutiny and experiencing changed, nonverbal behavior by some corporate representatives. None of these intangible actions changed the terms and conditions of Elmougy's employment, and there is no evidence of any particular hardship occasioned by Elmougy as a result. The alleged actions would not dissuade a reasonable person from filing a charge of discrimination and, as a

matter of law, are not materially adverse.

## V.

The retaliation claims also fail because EEOC and Elmougy have not demonstrated a causal connection between Elmougy's alleged protected activities and any alleged adverse action. *See Ackel v. National Commc'ns, Inc*., 339 F.3d 376, 385-86 (5th Cir. 2003). The evidence reveals no causal connection linking Elmougy's remarks to Caldwell in March 2001 and the adverse actions recounted by Elmougy, i.e., increased corporate sales scrutiny and his experiencing changed, nonverbal behavior by some corporate representatives. Caldwell was not involved in any of those actions, and it is well established that "in determining whether an adverse employment action was taken as a result of retaliation, our focus is on the final decisionmaker." *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002). Elmougy claims Sullivan, not Caldwell, scrutinized sales at the Mandalay and called more frequent meetings, and Elmougy does not include Caldwell in the group of corporate representatives exhibiting different behavior.

Moreover, the record is devoid of evidence of retaliatory animus by Caldwell. Elmougy concedes that Caldwell was never upset or angry about their March 2001 conversation, never treated Elmougy unfairly, and was always honest and decent in his dealings with Elmougy. Furthermore, the record establishes that Caldwell made an unannounced visit to Elmougy's office on September 26, 2001, to tell him Omni was proud of him and stood behind him. Caldwell would not have initiated such a meeting if he harbored animosity against Elmougy because of something Elmougy said to him more than six months earlier about the wait staff at Trevi's.

The timing of events further negates any inference of a causal connection. An eight-to-nine-month gap separates Elmougy's March conversation with Caldwell and the alleged retaliatory

action.  While an inference of proximate cause may be drawn when the adverse employment action follows close on the heels of a plaintiff's protected conduct, the temporal proximity must be "very close." *Clark*, 532 U.S. at 273-74 (citing *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period insufficient)).  Here, the lack of proximity coupled with the absence of any mention by any Omni employee about the March 2001 conversation weighs heavily against an inference of retaliation.

Additionally, with regard to greater sales scrutiny, Elmougy admits Sullivan began scrutinizing his sales and visiting the Mandalay two to three times a week in February 2001, one month before Caldwell approached Elmougy about the *Trevi's* staff.  These facts preclude any inference of retaliation as a cause of increased sales scrutiny by Corporate.

Nor have EEOC and Elmougy demonstrated a causal connection between Elmougy's purported comments to Rothschild and Smith on September 25, 2001, and any alleged adverse action, including Omni's removal of Elmougy as GM of the Mandalay and concurrent offer to transfer Elmougy to the Shoreham in December 2001.  Corporate repeatedly expressed its concerns to Elmougy about the financial conditions at the Mandalay during the many months before his September 25, 2001 conversation with Rothschild and Smith.  No evidence exists that Scartozzi, Dietemeyer, Caldwell or Rowling – alone or together – harbored retaliatory motives.  *See Strong v. University Healthcare Sys*., 482 F.3d 802, 806 n.2 (5th Cir. 2007) ("Collective decision-making is less susceptible to influence by an individual with a retaliatory motive.").

Elmougy claims retaliation based upon the timing of his removal from the Mandalay.  The Court finds that, considering the evidence as a whole, the two and a half month span does not meet

the temporal proximity requirement. Additionally, Elmougy continued to participate in Muslim-related public and media appearances after his alleged protected activity without experiencing any expression of concern by Omni. The decision to remove him from the Mandalay occurred well after these public comments and appearances, at a time when Omni was not aware that he was still speaking in public about CAIR or the Muslim faith. The evidence lacks a causal connection between anything Elmougy said on September 25, 2001, and his later Shoreham transfer offer.

## **VI**.

As noted above, Omni has met its burden of production regarding its legitimate, nondiscriminatory reasons for any alleged adverse actions. Consequently, EEOC and Elmougy bear the burden of persuasion under the pretext alternative for retaliation. *Sherrod*, 132 F.3d at 1122; *Alvarez v. UPS Co*., 398 F. Supp. 2d 543, 551 (N.D. Tex. 2005) (a retaliation claim follows a burden-shifting analysis similar to a discrimination claim).

Finally, EEOC and Elmougy have the burden to adduce evidence that Omni's proffered reason for his removal from the Mandalay and transfer to the Shoreham was merely a pretext. *See Sherrod,* 132 F.3d at 1122. To meet this burden, Elmougy must demonstrate that he would not have been terminated "but for" engaging in protected activity. *See id.* at 1123. Although this portion of the analysis may seem identical to the "causal link" step in the prima facie case, the burden here is more stringent. *See McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116-1117 (5th Cir.1983).

Unlike the pretext analysis for a discrimination claim, in a retaliation context EEOC and Elmougy must satisfy the more stringent burden of demonstrating that the adverse actions "would not have occurred 'but for' [the] protected conduct." *Strong*, 482 F.3d at 806 ("We think our decision in *Septimus* leaves no doubt that the but for standard controls. . ."); *Montemayor*, 276 F.3d

at 692; *Medina v. Ramsey Steel Co*., 238 F.3d 674, 684-85 (5th Cir. 2001); *Long*, 88 F.3d at 305.

As the trier of fact this Court cannot infer from the evidence that any alleged adverse action would not have occurred "but for" Elmougy's comments to Caldwell in March 2001. For the same reasons, EEOC and Elmougy cannot demonstrate a causal link, as described above, they cannot establish "but for" causation. No inference can be made from the evidence that the decision-makers had knowledge of the comments, much less a retaliatory motive. Elmougy's unsubstantiated subjective beliefs are insufficient to establish "but for" causation. Further, the more stringent "but for" standard is not satisfied when Elmougy either concedes or cannot dispute Omni's legitimate business rationale for increased sales scrutiny, temporary reassignment of responsibility for the Mandalay sales function, and transfer to the Shoreham. Thus, EEOC and Elmougy have no proof that such actions would not have occurred "but for" Elmougy's remarks to Caldwell many months earlier.

Moreover, there is no evidence that temporary reassignment of Elmougy's sales oversight and his subsequent removal from the Mandalay would not have occurred "but for" Elmougy's alleged "kicked while down" comments to Rothschild and Smith on September 25, 2001. Again, EEOC and Elmougy rely solely on the timing of events, which the Court does not deem to be very close. Temporal proximity between the protected activity and the adverse employment action alone is not sufficient to prove "but for" causation. *See Strong*, 482 F.3d at 808 (finding three and a half month time span insufficient, the court held "we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation.").

Omni's business decisions need not have been correct, good, or wise. A plaintiff cannot establish pretext where an employer makes an adverse employment decision in good faith, even

when the employer's decision may be faulty.  *See Bryant v. Compass Group USA, Inc*., 413 F.3d 471, 476 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones."); *Jones v. Flagship Int'l*, 793 F.2d 714, 729 (5th Cir. 1986) (it is sufficient that the employer "had reasonable grounds, or in good faith thought it did.").  The Court cannot infer from the evidence that the decision-makers at Omni would not have reached the same conclusions and made the same decisions in the absence of the allegedly protected activity.

## Conclusion

Elmougy's resignation was voluntary for personal reasons, and he did not prove a constructive discharge.  Omni did not take an adverse employment action against Elmougy.  Further, assuming it did, Elmougy's claims of national origin and religious discrimination fail because EEOC and Elmougy did not rebut Omni's legitimate, nondiscriminatory reasons for offering him a transfer to another flagship property.  Omni did not treat Elmougy less favorably than similarly situated employees.  Additionally, the Court cannot infer from the evidence that Omni's reasons were false or that his national origin or religion actually motivated the business decisions.  Therefore, EEOC and Elmougy did not prove damages for unlawful discrimination under Title VII.

EEOC and Elmougy's retaliation claims fail because Elmougy did not engage in protected activity and the alleged intangible harms do not constitute adverse employment actions.  Moreover, the evidence does not show a causal connection to any allegedly adverse employment actions because the decision-makers in each alleged incident of retaliation were not aware of Elmougy's alleged protected activity.  Further, the evidence does not show that Elmougy's allegedly protected activity caused Omni to treat Elmougy differently in the terms and conditions of his employment.  Therefore EEOC and Elmougy did not prove retaliation.

EEOC and Elmougy dismissed their claims for compensatory and punitive damages before trial. Elmougy did not suffer economic damages because EEOC and Elmougy did not meet their burden to prove Omni Hotels Management Corporation liable under Title VII. Further, all claims against Omni Hotels Corporation and Omni Hotels of Texas, Inc. fail as a matter of law because neither was Elmougy's statutory employer. Further, Omni Hotels of Texas, Inc. is not a jural entity.

The case having been tried and the issues duly decided, EEOC and Elmougy shall take nothing by way of their cause of action against Omni.

Signed September 26, 2007.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE